## CIRCUIT COURT OF FAIRFAX COUNTY

Intersections, Inc.

v.

Virginia Department of Taxation

November 8, 2006

Case No. CL-2005-4731

BY JUDGE KATHLEEN H. MACKAY

This matter came before the Court for a review of the Virginia Department of Taxation's ("Department's") assessment of a use tax upon Intersections, Inc. The tax was levied under Virginia Code § 58.1-604 (2001).

### I. *Background*

The Department accurately described the facts underlying Intersections' appeal. Intersections[] is a Delaware corporation that provides credit monitoring services to its subscribers based upon the information contained in the subscribers' credit files at one or all three of the major credit reporting agencies. Intersections entered into a Software License Agreement dated April 1, 1999 ("the Agreement") [sic] with Digital Matrix Systems ("DMS") to purchase certain software and to license DMS' proprietary software, Credit Toolkit™ to allow Intersections to perform in-house the services that DMS was previously providing under its 1997 agreements with

Intersections. These services included [1] "accessing data from the three principal credit bureaus (and others appropriate in the future), [2] transferring such data to common usable form, [3] converting such data into three bureau merged credit profiles for consumer use, [4] storing such reports and data for future use, [5] receiving periodic data reports from the bureaus, and [6] performing a monitoring function on all such data." Under the Agreement, DMS agreed to sell certain software and license its Credit Toolkit$^{TM}$ and Merge and Monitoring System software ["MMS"] to Intersections as well as provide support and maintenance services. [The Department] performed an audit of Intersections' books and records for the taxable period beginning September 1999 and ending December 2001. The Department assessed use taxes against Intersections on the licensing fees paid to DMS pursuant to the Agreement[] for the audit period. [sic] Intersections timely appealed the assessment to the Tax Commissioner pursuant to Virginia Code § 58.1-1821. The Tax Commissioner upheld the Department's assessment of the use tax and determined the software in question was delivered in tangible format based upon the language of the Agreement[] and was therefore not exempt from taxation. Intersections subsequently filed [this] Application for Correction of Erroneous or Improper Tax Assessment ... pursuant to Virginia Code § 58.1-1825 to challenge the Tax Commissioner's determination.

Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed September 13, 2006.

Pursuant to an August 31, 2006, Order of the Court, the parties filed a stipulated record on September 8, 2006. Cross-motions for summary judgment were filed on September 13, 2006, and the Court heard oral arguments on September 27, 2006. At that time, I took the parties cross-motions under advisement. Since the hearing date, I have had the opportunity to review all of the briefs and exhibits in light of oral arguments made, and I am now prepared to rule.

## II. *Analysis*

Virginia imposes a use tax "upon the use or consumption of tangible personal property." Va. Code § 58.1-604 (2001). Tangible property is "personal property which may be seen, weighed, measured, felt, or touched, or

is in any manner perceptible to the senses." Va. Code § 58.1-602 (2001). Section 58.1-609.5(1) of the Virginia Code provides an exception for "professional, insurance, or personal service transactions which involve sales as inconsequential elements for which no separate charges are made." Va. Code § 58.1-609.5(1) (2001). Transactions involving both tangible property and services are taxed *in toto* as either an exempt service or as taxable property according to whether the service or property is the "true object" of the transaction. 23 Va. Admin. Code 10-210-4040(D). *See, WTAR Radio-TV Corp. v. Commonwealth*, 217 Va. 877 (1977).

For purposes of the true object test, "[t]he object of any transaction which includes the transmittal of information through electronic means ... is deemed to be a service since the object of the transaction is to obtain the service of electronic information transmittal and tangible personal property included serves only as the medium for securing the service." 23 Va. Admin. Code 10-210-4040(D).

The Tax Commissioner's review of the April 1, 1999, Agreement established that the MMS and Credit Toolkit software were delivered in tangible format. The Commissioner reached this conclusion because the Agreement referenced "shipments of software," copies of the licensed software, and the physical place for delivery of the software. (Commissioner's January 13, 2006, Letter to Mr. Goetzinger, specifically noting sections 6, 8(d), and 21 of the Agreement.) The stipulated record did not dispute the Tax Commissioner's determination that the MMS software and Credit Toolkit™ were transmitted in tangible format. In this appeal, Intersections contends the Department's assessment of a use tax is impermissible despite the Tax Commissioner's ruling regarding the delivery format. The Court will grant relief to the taxpayer if the assessment is erroneous or improper. Va. Code § 58.1-1825 (2001). Plaintiff bears the burden of showing that the assessment "is erroneous or otherwise improper." *Id*.

Intersections has three distinct interactions with DMS. First, Intersections uses Credit Toolkit™ to facilitate its "Offline Batch Processing." Second, Intersections uses its proprietary "Sockets Application" to facilitate real-time "Online Credit Reporting." Finally, Intersections and DMS collaborate to perform a "Credit Report Comparison." In each of these three interactions, Intersections first sends data to DMS. Next, DMS' server, known as ADAM, retrieves credit information from the credit bureaus. Finally, DMS transmits the data ADAM retrieved back to Intersections. At oral argument, Intersections presented evidence that its use of Credit Toolkit™ during Offline Batch Processing constituted less than 25% of its interactions with DMS. Intersections then argued that the license for use of Credit Toolkit™ could not

be the "true object" of the Agreement because it constituted such a small percentage of total interactions between Intersections and DMS. This argument inaccurately assumes the Agreement establishes all interactions between Intersections and DMS. To the contrary, the Agreement provided for Intersections/DMS interaction during Offline Batch Processing.

The proper question is whether the "true object" of the Agreement was for Intersections to merely possess the MMS software and Credit Toolkit™, or whether Intersections licensed these software applications to access DMS' services, including the credit retrieval services provided by DMS' server, ADAM. Section 9 of the Agreement entitled DMS to $125,000.00 each month for the license of the MMS software and Credit Toolkit™. There is no dispute that the MMS software was obsolete and no longer in use by April 1999. Despite the obsolescence of MMS, Intersections continued to pay the full $125,000.00 monthly license fee to DMS. Intersections' payment in full is strong evidence that the fees paid between April 1999 and December 2001 were for the license of Credit Toolkit™.

Intersections could not have performed Offline Batch Processing for its customers without access to DMS' services. During Offline Batch Processing, Credit Toolkit™ functioned as a conduit between Intersections and DMS by pulling data from Intersections' directory and sending it to ADAM. Thus in the Agreement, Intersections transacted for both the transfer of software and access to the DMS credit retrieval services made possible by the software. The Department argued that possession of Credit Toolkit™ was the "true object" of the Agreement because Credit Toolkit™ was necessary for Intersections to transfer data with DMS. While Credit Toolkit™ was necessary for Intersections to transfer data with DMS, Intersections did not license Credit Toolkit™ merely to possess the software code, but to gain access to DMS' data monitoring, analysis, and delivery services. Accordingly, the "true object" of the Agreement was for Intersections' availment of DMS' credit related services.

The Court's decision is consistent with previous rulings of the Tax Commissioner that examined both the transfer of tangible property and the access to services the tangible property provided. In Ruling 04-131, the Commissioner examined a contract for access to a server which in turn provided access to current real estate listings. Va. Pub. Doc. Rul. 04-131 (September 16, 2004). In addition to paying a monthly lump sum for access to the server, the taxpayer's fee covered "hardware, software, training, set-up, and maintenance … [and] an instruction manual in tangible form." Id. The Commissioner ruled that, because "the server is necessary for the Taxpayer to give its customer access to its real estate listing database" and because

238

"[a]ccess to the server constitutes an exempt service," the true object was the use of the server. *Id*. In this case, the true object of the Agreement is access and use of ADAM and DMS' credit retrieval services.

Accordingly, Intersections is exempt from use tax on the license fees paid to DMS between April 1999 and December 2001.